EXHIBIT B

## ATTACHMENT D

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FIRST FLOOR AND BASEMENT OF THE PREMISES LOCATED AT 488 CENTRAL AVENUE, JERSEY CITY, NEW JERSEY, WHICH IS MORE PARTICULARLY DESCRIBED IN ATTACHMENT A | **TO BE FILED UNDER SEAL** <br><br> Hon. Joseph A. Dickson, U.S.M.J. <br><br> Mag. No.  19-6624 <br><br> **SEARCH WARRANT** <br> **AFFIDAVIT** |

STATE OF NEW JERSEY          :
                                                  : ss.
COUNTY OF ESSEX              :


I, Michael Patti, being duly sworn, depose and say:

1.      I am a Task Force Officer with the United States Drug Enforcement

Administration ("DEA"), and have been from October 2012 through May 2017, and

from August 2018 to the present. As such, I am an "investigative or law

enforcement officer" within the meaning of Title 18, United States Code, Section

2510(7), that is, an officer of the United States who is empowered by law to

conduct investigations and to make arrests for offenses enumerated in Title 21,

United States Code, Sections 841 and 846.  I am thoroughly familiar with the

information contained in this affidavit, based upon the investigation that I have

conducted with other experienced law enforcement officers, my communications

with them and other witnesses, and my review of documents and items.

2.      My experience as a Task Force Officer has included, among other things, the investigation of cases involving offenses enumerated in Title 18, United States Code, Section 2516. Before joining the DEA, I was a Detective with the Hudson County Prosecutor's Office assigned to the Narcotics Task Force. Before becoming a Detective with the Hudson County Prosecutor's Office, I was an officer with the Seaside Park Police Department and the Passaic County Sheriff's Office. I have been in law enforcement since 2009. During my career as a law enforcement officer, I have participated in numerous investigations of crimes, including unlawful drug trafficking, have among other things, conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire communications. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, and the lingo and coded language used by narcotics traffickers. I have not included every detail of every aspect of my training, education, and experience, but have highlighted those areas most relevant to this application.

3.      This affidavit is submitted in support of the application of the United States for an anticipatory warrant to search the ground-floor and the basement of the premises located at 488 Central Avenue, Jersey City, New Jersey, as more

particularly described in Attachment A (hereinafter referred to as the **"Subject Premises"**). A search of the **Subject Premises** will occur only upon the occurrence of certain specified events, which are described below, namely once a parcel had previously contained approximately 400 grams of cocaine, is accepted by an occupant of the **Subject Premises** and the respective parcel crosses the threshold into the **Subject Premises**.

4.      Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to search the **Subject Premises** and to seize any items set forth in Attachment B. The information contained in this Affidavit is based upon my personal knowledge of the facts and circumstances of this investigation, my training and experience, conversations with other law enforcement officers involved in this investigation and witnesses, the documents and records, and from a variety of other sources. Based upon the information set forth herein, there is probable cause to believe that the **Subject Premises** will contain controlled substances and related records and paraphernalia, in violation of Title 21, United States Code, Sections 841 (manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense a controlled substance) and 846 (attempt or conspiracy to traffic in or possess a controlled substance) (the "Specified Federal Offenses").

5.     Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics.  I am also familiar with the manner in which narcotics traffickers use common carriers, mail, private delivery services, and a variety of other means, to: (a) meet with co-conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

6.     Based on my training and experience, I know that narcotic trafficking typically involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Within the United States and the District of New Jersey, illegal drugs and drug money are often transported through the US Mail and other parcel companies.

7.     I know from my training and experience that U.S. Postal Service Express Mail and Priority Mail are frequently utilized by drug traffickers for shipping drugs and drug proceeds.  Use of Express Mail and Priority Mail are favored because of the speed, reliability, free telephone and internet package tracking service, as well as the perceived minimal chance of detection.  Express Mail was originally intended for urgent, business-to-business, correspondence. However, based on law enforcement intelligence, and my personal experience with

numerous prior packages that were found to contain contraband, packages containing contraband are usually sent from an individual to an individual.

8.     In or around late 2018, law enforcement began investigating Felix Santiago, III ("Santiago") for violations of the Specified Federal Offenses. Based on the investigation, law enforcement learned that Santiago regularly travels to Puerto Rico and obtains large quantities of narcotics that he subsequently ships back to the United States using the United States Postal Service. The investigation has revealed that Santiago has devised ways in which to divide the shipments, so as to mitigate any potential losses. Santiago's conspiracy takes two general formats. In some instances, Santiago ships parcels to the **Subject Premises**. In other instances, Santiago ships parcels to 1085 Summit Avenue, Jersey City, New Jersey – in these instances, Santiago typically has a "runner" who will receive the parcel and then deliver it to the **Subject Premises**. The investigation has revealed that Santiago utilizes the basement of the **Subject Premises** to process and store the narcotics that he ships into New Jersey from Puerto Rico. The investigation has also revealed that Santiago utilizes a safe within the basement of the **Subject Premises** to store narcotics.

9.     Santiago has multiple felony convictions, most of which are narcotics-related. In or around 1999, Santiago was convicted of possession of a weapon and sentenced to four to eight years' incarceration.  In or around 1997, Santiago was federally convicted of conspiracy to distribute cocaine and was sentenced to 70

months' incarceration. In or around 2000, Santiago was federally convicted of conspiracy to distribute cocaine and was sentenced to 70 months' incarceration. In or around 2009, Santiago was federally convicted of conspiracy to distribute cocaine and was sentenced to 70 months incarceration. In or around 2012, Santiago was federally convicted of conspiracy to distribute and possession with intent to distribute cocaine and was sentenced to 46 months' incarceration.

10.    Law enforcement has developed significant information regarding Santiago's pattern of travelling to Puerto Rico, shipping packages to New Jersey, and returning to New Jersey to collect the package(s). For instance:

a. On or about November 30, 2018, Santiago flew from Newark, New Jersey to San Juan, Puerto Rico. On or about December 10, 2018, a parcel bearing USPS Tracking Number 9505511114748344157559 (the "7559 Parcel") was shipped to 1085 Summit Avenue, Jersey City, New Jersey. Santiago flew from San Juan, Puerto Rico to Newark, New Jersey on or about December 10, 2018. The 7559 Parcel was delivered on or about December 15, 2018.

b. On or about February 7, 2019, Santiago flew from Newark, New Jersey to San Juan, Puerto Rico. On or about February 13, 2019, a parcel bearing USPS Tracking Number 9505511114749044206851 (the "6851 Parcel") was shipped from Puerto Rico to 488 Central Avenue, Jersey City, New Jersey. On or about February 14, 2019, a

parcel bearing USPS Tracking Number 9114901496451425235658 (the "5658 Parcel") was shipped from Puerto Rico to 1085 Summit Avenue, Jersey City, New Jersey. On or about February 14, 2019, at approximately 1:00 p.m., Santiago flew from San Juan, Puerto Rico to Newark, New Jersey.

c.  On or about March 5, 2019, Santiago flew from Newark, New Jersey to San Juan, Puerto Rico. On or about March 15, 2019, a parcel bearing USPS Tracking Number 9505511114749074225303 (the "5303 Parcel") was shipped from Puerto Rico to 1085 Summit Avenue, Jersey City, New Jersey. On or about March 15, 2019, a parcel bearing USPS Tracking Number 9114999944313475865492 (the "5492 Parcel") was shipped from Puerto Rico to the **Subject Premises**. The 5303 Parcel and the 5492 Parcel were both delivered on or about March 18, 2019. On or about March 18, 2019, law enforcement conducted controlled deliveries of the 5303 Parcel and the 5492 Parcel. At approximately 2:45 p.m., law enforcement delivered the 5303 Parcel to 1085 Summit Avenue, Jersey City, placing it in the vestibule of the building. At approximately 2:50 p.m., law enforcement delivered the 5492 Parcel to 488 Central Avenue, Jersey City, New Jersey, placing it in the vestibule behind the door leading to the residential section of the building. Shortly thereafter,

law enforcement observed Santiago exit the **Subject Premises** and walk across the street, appearing to conduct counter-surveillance. Law enforcement then observed Rodriguez exit the **Subject Premises** and enter the door to the residences above 488 Central Avenue. Rodriguez emerged shortly thereafter, carrying an unidentified object, and entered the pizzeria. Shortly thereafter, Santiago returned to the pizzeria. At approximately 2:55 p.m., law enforcement observed Rodriguez leave the pizzeria and travel to 1085 Summit Avenue, Jersey City. Rodriguez entered 1085 Summit Avenue and quickly emerged carrying a parcel that appeared to be the 5303 Parcel. Rodriguez then drove directly to the pizzeria, exited the vehicle, and carried the parcel into the pizzeria.

d. In or around the last week in March 2019, Santiago flew from Newark, New Jersey to San Juan, Puerto Rico. On or about March 27, 2019 a parcel bearing USPS Tracking Number 9114999944313475869742 (the "9742 Parcel") was shipped from Puerto Rico to 1085 Summit Avenue. On or about March 27, 2019, a parcel bearing USPS Tracking Number 9505511114719086601310 (the "1310 Parcel") was shipped from Puerto Rico to 488 Central Avenue. On March 29, 2019, law enforcement conducted controlled deliveries of the 9742 Parcel and the 1310 Parcel. At approximately

12:49 p.m., law enforcement observed Robert Rodriguez in the area of 488 Central Avenue. At approximately 1:43 p.m., law enforcement delivered the 1310 Parcel to 488 Central Avenue. As the postal truck pulled up, law enforcement observed Santiago pull up and park down the block. Law enforcement then observed Robert Rodriguez step out of the pizzeria, greet the postal carrier and take custody of the 1310 Parcel. Rodriguez then carried the parcel into the pizzeria and exited shortly thereafter, empty-handed. Rodriguez entered his vehicle and proceeded to the area of 1085 Summit Avenue. Law enforcement observed Rodriguez park in the area and walk to 1085 Summit Avenue, where he met the postal carrier. Rodriguez opened the vestibule to 1085 Summit Avenue and both he and the postal carrier entered. Shortly thereafter, Rodriguez exited 1085 Summit Avenue with the 9742 Parcel. Rodriguez entered his vehicle and drove back to 488 Central Avenue. Rodriguez met Santiago outside of the pizzeria. After a brief conversation, Rodriguez removed the parcel from his vehicle and placed it in the trunk of Santiago's vehicle. Santiago then left the area. Law enforcement attempted to surveil Santiago, but ultimately lost sight of him.

11.     On or about April 5, 2019, law enforcement learned that Santiago had travelled to Puerto Rico. On or about April 9, 2019, a parcel bearing USPS

Santiago, 08/22/19 First Production, 0062

tracking number 9505516209419099327949 (the "7949 Parcel") was mailed from the San Juan Main Post Office in San Juan, Puerto Rico, to the **Subject Premises**. The 7949 Parcel bears a handwritten label listing a delivery address of "Mr. Gallo, 488 Central Ave. #1, Jersey City, NJ 07307" and a return address of "Carmen Trujillo, Condominio Astralis Suite #1015, Carolina, PR 00979." The 7949 Parcel is a large, flat rate Priority Mail box approximately 12" x 12" x 5" in dimension, and approximately 5 pounds and 12.5 ounces in weight. The 7949 Parcel bears a Postal Validation Imprinter postage strip in the amount of $19.95. On or about April 10, 2019, law enforcement observed Santiago to be physically present at the **Subject Premises**.

12.     Based on my training and experience in narcotic related investigations in New Jersey, I know that Puerto Rico is one source location for the shipment into the continental United States of illicit substances including cocaine. I have personally been involved in numerous investigations in which inbound packages from Puerto Rico into the District of New Jersey were lawfully seized and found to contain cocaine.

13.     On or about April 11, 2019, the 7949 Parcel arrived at the USPS processing facility in Jersey City, New Jersey. Shortly after its arrival, law enforcement presented the parcel to a canine trained in narcotics detection.

14.     On or about April 11, 2019, the 7949 Parcel was presented for examination by a trained law enforcement narcotics detection canine named

"Bred." According to Bred's handler, Officer Michael Sansevere, of the Bergen County Sheriff's Office, Bred is a certified narcotics dog, and was last certified in April 2019. When Bred detects the odor of a narcotic substance, he is trained claw at or near the object. On April 11, 2019, at approximately 8:32 a.m., Bred alerted law enforcement to the odor of a controlled substance present on or within the 7949 Parcel.

15.     Based on the foregoing, on or about April 11, 2019, law enforcement appeared before the Honorable Joseph A. Dickson, U.S. Magistrate Judge, and received judicial authorization to open and search the 7949 Parcel. See Mag. No. 19-6599. Law enforcement executed the warrant shortly thereafter, and observed two small rectangular packages that were secreted inside of two Amazon Echo machines within the 7949 Parcel. The substances subsequently field tested positive for cocaine and were determined to weigh approximately 400 grams.

16.     Based upon my training and experience and conversations with other agents with whom I have spoken, persons who are engaged in drug distribution and conspiracy to commit same through the U.S. mail system regularly maintain records and have the types of items as set forth in Attachment B.  Conspirators need to keep track of the current status of the various illegal transactions in which they are involved, the expenses incurred in connection with such transactions, and the amount of profit derived therefrom.  Since each suspect must protect himself against false or mistaken claims by those with whom he is

associated in the criminal venture, and since the activity by its very nature is clandestine and often involves multiple transactions of some complexity, the possibility of deceit, error, or misunderstanding is extremely high. Because of the expense and the sensitivity of the illegal operation, careful and accurate record keeping is essential. The records appear in various forms, including coded notations relating to the identities of co-conspirators, documents reflecting financial documents, such as an interest in hidden investments, deposit slips, passbooks, and statements for hidden bank accounts, and documents concerning the transfer and disposition of prescription drugs, money, and other assets, such as U.S. Postal Service documentation, labels, mailing receipts, messages, notations, receipts, correspondence, as well as documents related to the location of distribution points and pickup sites.

17.    On or about April 11, 2019, law enforcement plans to make a controlled delivery of the 7949 Parcel to the **Subject Premises**. Acknowledging the inherent risk associated with such an operation, "sham," a mixture that appears to be cocaine but actually only contains a small percentage of the drug, will be used instead of the actual packages of cocaine found in the 7949 Parcel. After the 7949 Parcel is delivered to Santiago or another occupant of the **Subject Premises** and that individual enters the **Subject Premises** the location will contain evidence, fruits, and instrumentalities of criminal offenses, including the Specified Federal Offenses. Accordingly, at that time, probable cause will exist to

search the **Subject Premises** and seize evidence, fruits, and instrumentalities of violations of the Specified Federal Offenses.

18.    Based on my training, experience, and participation in this and many other narcotics trafficking investigations, as well as my conversations with other agents and officers involved in this and other such investigations, I believe the following:

a.    Drug traffickers commonly use residences and garages to receive and store narcotics.  Such locations often serve as a base of operation for a narcotics trafficking organization.

b.    Although quantities of narcotics sometimes move very quickly from one location to another as they are sold, records, documents, and electronic devices frequently are maintained in these locations on a continuing basis and for longer periods.

c.    Such locations frequently contain materials and records used in connection with the business of distributing and selling drugs, including accounting records, ledger books and sheets, notations, account balances, United States currency and closed containers securing such currency, money orders, cashier checks, records of the electronic transfer of funds, telephones, including cellphones, personal address books and telephone directories, Rolodex indices, personal data assistants ("PDAs"), Blackberries, Sidekicks and other PDA-type devices, photographs of associates and subjects, adding machines and adding machine tapes, calculators, computers and

Santiago, 08/22/19 First Production, 0066

computer discs, diskettes, cassettes, and tapes.

          d.     Traffickers of narcotic drugs frequently maintain large amounts of United States currency on hand in order to maintain and finance their ongoing business.

          e.     Drug traffickers commonly keep paraphernalia for packaging and distributing controlled substances.

          f.     Narcotics traffickers frequently keep firearms and ammunition in their bases of operation, such as hotel rooms or residences, to protect narcotics and the proceeds of narcotics trafficking, and to protect themselves from rival dealers.

          g.     Narcotics traffickers routinely keep closed containers inside of which they keep narcotics, narcotics paraphernalia, firearms, ammunition, books, records, and other documents containing the names, addresses, and/or telephone numbers of narcotics trafficking associates, and currency and/or other valuables used to purchase narcotics or which reflect the proceeds of narcotics sales.  Such containers include safes, key-lock strong boxes, suitcases, hidden compartments, and other instruments, which are further secured by combination and/or key locks of various kinds.

Based on my training, experience, participation in other investigations concerning narcotics trafficking, and extensive discussions with other law enforcement agents, I know that individuals who traffic narcotics routinely secrete and store

books, records, documents, currency and other items of the sort described in Attachment B to this Affidavit.

19.     Based on the facts set forth in this Affidavit, I respectfully submit that there is probable cause to believe that there will be in the **Subject Premises** fruits, evidence, and instrumentalities of violations of federal law, including violations of Title 21, United States Code, Sections 841 (distribution of narcotics) and 846 (conspiracy to distribute narcotics), which evidence consists of the items set forth in Attachment B hereto.

20.     WHEREFORE, I respectfully request that a search warrant be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, authorizing law enforcement personnel to search the **Subject Premises** set forth in Attachment A hereto, as well as any locked or closed safes or other containers therein including, where necessary by using force to open such locked or closed containers and safes.   I further request that the warrant authorize law enforcement personnel searching the **Subject Premises** to search for and to seize those items set forth in Attachment B hereto.

21.     It is further respectfully requested that this Court issue an Order, pursuant to which the Application of the United States and all papers submitted in support of the application be filed under seal.  The evidence to be seized and the information upon which the application is based are relevant to an ongoing investigation and premature disclosure of the Affidavit and related

documents may jeopardize its effectiveness.

Michael Patti, Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me

this 11th day of April, 2019.

HONORABLE JOSEPH A. DICKSON
United States Magistrate Judge

Santiago, 08/22/19 First Production, 0069

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

488 Central Avenue, Jersey City, New Jersey is described a three-story, mixed-use building. The front facade of the building appears to be constructed of brick. The ground-level floor contains "Firehouse Blazing Pizza." There is a large garage-door type window on the ground level that appears to have approximately 16 glass panes framed by red panels. Immediately above the first floor, there is a sign bearing the name of the business (Firehouse Blazing Pizza) with a firehouse insignia and the business's telephone number. The top two floors are residential in nature. Each of the top two floors has four windows on the front of the building. There are two doors on the front of the building. The door on the left is glass and leads into the pizzeria. The door on the right is red in color and leads to the residential areas of the building. The **Subject Premises** has a basement as well. A photograph of the exterior of the front of **Subject Premises** appears on the following page.

**IMPORTANT NOTICE: THIS SEARCH WARRANT MAY NOT BE EXECUTED UNTIL THE FOLLOWING CONDITION OCCURS:**

Once the Parcel described in Paragraph 1 of Attachment B is physically accepted and transported inside the **Subject Premises** probable cause will exist to believe that evidence, fruits, and instrumentalities of a violation of federal laws will be located at that specific location.



## ATTACHMENT B

### ITEMS TO BE SEIZED

This Warrant authorizes law enforcement to enter the **Subject Premises** specified in the caption and described in Attachment A, including, where necessary, by means of trespass over private property, and to search for and seize instrumentalities, evidence, and fruits of violations of 21 U.S.C. §§ 841 and 846 including the following:

1. Any all controlled substances, including, but not limited to cocaine, and substances and mixtures containing cocaine and/or traces of cocaine;

2. Monies, financial records, ledgers, papers, photographs, telephones, adding machines and adding machine tapes, calculators, cassettes and tapes, compact discs, identification documents, travel documents, and other property, documents and records and closed containers inside of which the above may be kept that constitute evidence of the commission of, or are designed or intended as a means of the violation of, or are contraband or the fruits of, the federal narcotics laws;

3. Paraphernalia used in the manufacture, packaging, cutting, and weighing of illicit narcotics in preparation for trafficking;

4. Firearms and ammunitions, including but not limited to handguns and automatic weapons;

5. Bank statements, bank checks, cash receipts, money transfer records and receipts, money remittance instructions, customer information and records, sales records, ledgers showing cash and checks received, contracts, fax records, correspondence, including but not limited to correspondence with others regarding the transmission of money, printed emails, letters, faxes, and telephone logs or messages that constitute evidence of narcotic trafficking or the receipt or transmittal of narcotics proceeds;

6. Records, information, and data identifying customers, associates and co-conspirators, including photographs, cellular telephones, address books, telephone books, Rolodex indices, personal data assistant ("PDA") entries, PDAs, Blackberries, Sidekicks and other PDA-type devices, and personal notes reflecting telephone and pager numbers, email addresses and

phone records;

      7.  Indicia of occupancy, residency, and/or ownership of the premises to be searched; and

      8.  Safes, key-lock strong boxes, suitcases, locked cabinets, and other types of locked or closed containers used to secrete and store currency, narcotics paraphernalia, books, records, documents, financial instruments, and other items of the sort described in subparagraphs (1) through (7) above. Law enforcement officers executing this Warrant are specifically authorized to open any such locked safes or containers including, where necessary, by using force.

## ATTACHMENT C

Evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 (manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense a controlled substance) and 846 (trafficking, possession and conspiracy to traffic in and possess controlled substances).